# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI

DARIAN HALL and ABUBAKAR
MOHAMED, on behalf of themselves and
all others similarly situated,

                    Plaintiffs,

    v.

WHC KCT, LLC, d/b/a zTrip
<u>Serve Registered Agent</u>:
National Registered Agents, Inc.
5661 Telegraph Rd., Ste. 4B
St. Louis, MO 63129

                Defendant.

Case No.

Division

## <u>COLLECTIVE AND RULE 23 CLASS ACTION COMPLAINT</u>

Plaintiffs, Darian Hall and Abubakar Mohamed, on behalf of themselves and all others similarly situated bring this action against Defendant WHC KCT, LLC for damages and other relief relating to violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.*, ("FLSA"), the Missouri Minimum Wage Law ("MMWL"), Mo. Rev. Stat. §§ 290.500 *et seq.*, and the Missouri common law.

Plaintiffs assert their FLSA claims as a collective action under 29 U.S.C. § 216(b) on behalf of all similarly situated drivers, as further described below, who are in an employment relationship with Defendant and are not being paid and or have not been paid time and one-half their regular rate of pay for all hours worked during a workweek above forty hours.

Plaintiffs assert their MMWL and common-law claims as class actions under Federal Rule of Civil Procedure 23 and the proposed class definitions further set forth

-1-

below. Plaintiffs allege the following based on personal knowledge of their own experiences and on information and belief of experiences of other similarly situated drivers.

## NATURE OF THE ACTION

Defendant lured Plaintiffs and similarly situated drivers to apply and drive for Defendant by promises of high hourly wages and the opportunity for drivers to run their own businesses. But as soon as Plaintiffs and similarly situated drivers started work, Defendant's conduct rendered both promises empty. Defendant reduced the drivers' advertised hourly wages to a mere fraction of their promised value by deducting unilaterally fixed, non-negotiable fees from Plaintiffs' and similarly situated drivers' paychecks. Additionally, Defendant refused Plaintiffs and similarly situated drivers the entrepreneurial opportunities it had promised by exerting extensive control over Plaintiffs' and similarly situated drivers' daily work. Defendant has reaped the benefits of a traditional employment relationship from Plaintiffs and similarly situated drivers without granting these drivers the benefits of employment status, including the right to overtime pay. Plaintiffs, individually and on behalf of similarly situated drivers, now bring this collective and class action to recover the pay they are due and to recover the exorbitant, non-negotiable fees that Defendant wrongfully excluded from their paychecks.

## JURISDICTION AND VENUE

1. This Court has original jurisdiction to hear this Complaint and to adjudicate Plaintiffs' claims under 28 U.S.C. § 1331 because Plaintiffs bring claims under the FLSA, 29 U.S.C. §§ 201 *et seq.*

-2-

2.     This Court has supplemental jurisdiction over Plaintiffs' state-law statutory and common-law claims under 28 U.S.C. § 1367 because Plaintiffs' state-law claims are so related to their FLSA claims that they form part of the same case or controversy.

3.     Venue is proper in the United States District Court for the Western District of Missouri under 28 U.S.C. § 1391 because Defendant operates its principal place of business in Kansas City, Missouri, Defendant does business in this district, and a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.

## PARTIES

4.     Defendant WHC KCT, LLC, which does business as zTrip, operates at its principal place of business in Kansas City, Missouri, in Jackson County. WHC KCT, LLC is a Missouri limited liability company registered to do business, and in good standing, in the state of Missouri. WHC KCT, LLC's registered agent is National Registered Agents, Inc., 5661 Telegraph Rd. Ste. 4B, St. Louis, MO 63129.  Defendant WHC KCT, LLC will be referred to herein as Defendant or zTrip.

5.     Defendant is engaged in interstate commerce by, among other things, passenger-transportation services, micro-transit, and paratransit in metropolitan areas across state lines.

6.     Upon information and belief, Defendant's gross annual sales made or business done has been $500,000 per year or greater at all relevant times.

7.     At all relevant times, as will be further set out and described below, Defendant is, and has been, an "employer" of Plaintiffs, and others similarly situated, that

-3-

is engaged in interstate commerce and or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. § 203(d).

8.     At all relevant times, as will be further set out and described below, Defendant is, and has been, an "employer" within the meaning of the MMWL, Mo. Rev. Stat. § 290.500(4).

9.     Plaintiff Abubukar Mohamed is an adult resident of Missouri who currently resides in Kansas City, Missouri in Platte County. Mr. Mohamed worked for Defendant as a full-time micro-transit driver from April 2024 to June 2025.

10.     Plaintiff Darian Hall is an adult resident of Missouri who currently resides in Kansas City, Missouri in Clay County. Mr. Hall has worked for Defendant as a driver since April of 2023, and he began consistent full-time work for Defendant's micro-transit program around August 2023.

11.     Numerous other drivers worked and currently work for Defendant's micro-transit program.

12.     At all relevant times, as will be further set out and described below, Plaintiffs and others similarly situated are current or former "employees" of Defendant within the meaning of the FLSA, 29 U.S.C. § 203(e)(1).

13.     At all relevant times, as will be further set out and described below, Plaintiffs and others similarly situated are current or former "employees" of Defendant within the meaning of the MMWL, Mo. Rev. Stat. § 290.500(3).

14.     Plaintiffs and others similarly situated have worked for Defendant within two to three years prior to the filing of this lawsuit. *See* 29 U.S.C. § 255(a); Mo. Rev. Stat. § 290.527.

15.     Plaintiffs bring this action on behalf of themselves and other similarly situated drivers, according to the proposed collective definition set forth below, under 29 U.S.C. § 216(b).

16.     Plaintiffs also bring Missouri common-law and statutory claims on behalf of proposed classes of drivers under Federal Rule of Civil Procedure 23, as further defined and set forth below.

## ALLEGATIONS COMMON TO ALL COUNTS

17.     When a job candidate expresses an interest in working for Defendant, they are invited to attend an unpaid recruitment meeting at Defendant's worksite.

18.     At the meeting, Defendant generates excitement about the IRIS program, telling attendees that they can run their own businesses, enjoy significant freedom, and make $60,000 to $200,000 per year.

19.     Defendant tells attendees that they will be treated as independent contractors, which will be to drivers' benefit, as they will be able to write off from their taxes gas and other costs, clothing purchases, and beauty and grooming expenses, among others.

20.     Defendant also tells drivers that zTrip will cover the bulk of the operating costs.

21.     In April 2023, Plaintiff Darian Hall attended a recruitment meeting and, hopeful about the opportunity, decided to seek employment formally.

-5-

22.     In April 2024, Plaintiff Abubakar Mohamed also attended a recruitment meeting, felt hopeful about the job's promise, and decided to pursue employment.

23.     To pursue positions, the Defendant required Plaintiffs to follow all processes involved with traditional employment: Plaintiffs applied for positions through Defendant's portal, Plaintiffs submitted a mandatory drug test urinalysis and fingerprints using Defendant's processes, Plaintiffs completed an online driving safety course, and Defendants ran Plaintiffs' background checks.

24.     Only after Defendant received both a negative drug-screen report and a satisfactory background-check report did the company invite Plaintiffs to move to the next steps in their employment process: a compulsory, all-day orientation held in a classroom at zTrip's Kansas City facility.

25.     At the orientation, Plaintiffs learned that they would constantly be monitored by in-car cameras and that footage could be the basis for discipline; they were required to sign off on a multitude of policies telling them how to dress, behave, handle their cell phones, use company cars and company devices, maintain company vehicles, and communicate with zTrip dispatch.

26.     Plaintiffs could not log into Defendant's system for their first shift until Defendant audited and approved Plaintiffs' files.

27.     Plaintiffs had no ability to negotiate, modify, or bypass any of these screening steps; every requirement was imposed unilaterally by Defendant and applied uniformly to all prospective IRIS drivers.

**zTrip's Mandatory "Independent Contractor" and "Policy" Agreement**

30. Despite its orientation setting the stage for Defendant's overwhelming control of the Plaintiffs, Defendant ended the orientation by handing each Plaintiff packets that repeatedly characterized the driver as an "independent contractor," disclaimed any employment relationship, and required the driver to acknowledge that the driver lacked the state and federal statutory benefits of employment. The packets expressed zTrip's intention to exercise pervasive, day-to-day supervisory control over Plaintiffs' performance, imposing detailed dress, cleanliness, conduct, and break requirements coupled with real-time surveillance and an escalating discipline system.

31. Defendants required Plaintiffs to sign the independent-contractor packet on the spot, told them it was "approved by corporate" and non-negotiable, and did not provide Plaintiffs time to consult counsel, study the terms, or take the packet off-site for review.

32. Plaintiffs had no meaningful opportunity to negotiate compensation, deductions, disciplinary standards, or termination provisions; every economic and operational aspect of the relationship was dictated solely by zTrip.

**Scheduling is Set and Enforced by zTrip**

33. When the Plaintiffs began working for the Defendant, they quickly learned that their schedules were locked in and outside their control; they could not choose to end a day early to attend a child's game, take two hours off to go to the doctor, or attend to other family needs.

34. zTrip unilaterally determines every IRIS driver's work schedule. Each week, a member of zTrip's operations team uploads a roster that specifies the exact start time, end

-7-

time, and geographic area for every IRIS shift during the following week. IRIS drivers log into Defendant's online platform to see the schedule zTrip has assigned.

35.     When an IRIS driver needs time off, they must make a request far in advance to a single scheduling manager, and the request will be granted only in management's discretion based on business needs. Defendant repeatedly told Plaintiffs that unauthorized schedule changes would be subject to discipline.

36.     IRIS drivers must clock in before the start of their shift using Defendant's device and, if a driver clocks in even a few minutes late, $50 is automatically deducted from their paychecks.

37.     If an IRIS driver fails to appear at the precise location by the rostered start time, Defendant's dispatchers call them, text them and, after ten minutes, remove them from their shift. The absence is then logged as an attendance violation that counts toward progressive discipline.

38.     zTrip maintains direct, day-to-day control over the timing and manner in which Plaintiffs perform their work because zTrip alone sets the weekly schedule, refuses unilateral changes, and disciplines drivers for late arrivals or location variances through automatic monetary penalties and attendance strikes.

### IRIS Drivers Lack Control Over Ride Assignments

39.      IRIS drivers receive ride assignments through Defendant's system and equipment, and all such assignments must be accepted. If the acceptance rate falls too low, Defendant's dispatch will contact the driver with a warning that the driver's acceptance rate has dropped and they risk being forcibly logged off from the platform. If the rate falls

below a threshold acceptable to Defendant, Defendant forcibly logs the driver off the platform for the remainder of the shift, preventing further earnings.

40. Once a trip is accepted, the software immediately begins downloading navigation for the next leg (often before the current passenger has been delivered), pre-planning routes without showing the driver the complete itinerary. Drivers are required to follow the tablet's directions and may not deviate unless Defendant's dispatch grants express permission.

41. A driver's every movement is tracked. If an IRIS driver parks because he or she has no current assignment or simply stops to take a break, Defendant calls or texts the driver and treats the pause as a performance infraction in the driver's record. When a driver needs to use the restroom, he or she must contact Defendant's dispatch and make a request; meal breaks must be planned and approved by Defendant's dispatch.

42. Beginning in or about July 2024, zTrip unilaterally merged "Ride KC Freedom" paratransit trips into the same dispatch stream. Ride KC Freedom serves people in wheelchairs and people with other disabilities who need special transport. Because these rides take added time and skill, Defendant had previously compensated such drivers at a higher rate than what IRIS drivers were paid.

43. But when Defendant merged the programs, Defendant paid IRIS drivers at the lower IRIS rate and gave them no option to filter out or decline Ride KC Freedom assignments. Rejecting too many trips in any single shift reduced the driver's acceptance rate below zTrip's pre-determined threshold, causing automatic log-off under the policy.

-9-

44.     Through this algorithmic system controlling which rides appear, measuring acceptance rates, logging drivers off for perceived non-compliance, and unilaterally inserting new categories of trips, zTrip exercised continuous electronic and human supervision and retained the power to grant or withhold Plaintiffs' access to work.

45.     Plaintiffs had no meaningful discretion to select passengers, set routes, negotiate compensation, or determine the sequence of assignments; every operational decision after clock-in was dictated by zTrip's proprietary software and enforced by automated penalties.

### Prices, Equipment, and Economic Terms are Fixed by zTrip

46.     Defendant unilaterally sets the fare schedule and compensation structure for all IRIS work.

47.     While the Defendant told IRIS drivers they would make thirty-two to thirty-seven dollars ($32–$37) per service hour, drivers never actually know what they will be paid, and drivers find their pay to be far lower than what was represented.

48.     When drivers log into Defendant's portal to view their pay stubs, they find pay deductions for a daily vehicle-lease fee for the branded vehicles Defendant owns.[1]

49.     Each week, drivers find their pay deducted for a weekly insurance premium, typically around $25.00 per week to cover auto liability and physical-damage coverage to

---

[1] Though zTrip supplies a fleet of branded vehicles, a driver may request to use a personally owned vehicle; however, the vehicle must still meet certain maintenance, inspection, insurance, and branding requirements, and zTrip will still deduct a daily fee from the driver's pay for participating in the IRIS program. These conditions are non-negotiable and must be reaffirmed annually. These barriers mean that few drivers exercise

Defendant's vehicles. The policy is negotiated solely by zTrip, and drivers cannot substitute their personal coverage for zTrip's mandatory insurance.

50.     When IRIS drivers log into Defendant's portal, they also see a weekly tablet-rental charge for the IRIS device that delivers assignments, plus a cellular-data fee to cover the SIM card embedded in the unit. These equipment costs are mandatory regardless of the number of hours worked or trips completed.

51.     The amounts continue to build. IRIS drivers find deducted from their pay monthly carwash fees for a carwash facility that Defendant selected. Drivers may not opt out of Defendant's carwash fee to choose a lower-priced facility.

52.     Drivers find deducted from their pay a "voucher processing fee" for zTrip's processing of their pay, typically five percent (5%) of any given paycheck, which is not disclosed at the point of ride acceptance and varies at zTrip's discretion. The company furnishes no accounting that would allow drivers to verify the percentage or its calculation.

53.     A driver may also find deducted from their pay monies for alleged policy violations that the Defendant alone determined occurred.

54.     After the Defendant makes this plethora of deductions from drivers' earnings, drivers receive an anemic remainder as their pay.

---

this option and, even when they do, Defendant exercises overwhelming control over the driver and vehicle.

55.     Drivers have no ability to increase passenger fares, negotiate lower lease or insurance rates, shop for independent coverage, or opt out of carwash and voucher-processing fees. Every economic term, including price, cost, and method of collection, is fixed solely by zTrip and may be modified unilaterally upon short notice.

56.     zTrip exerts comprehensive control over the prices and economic realities of Plaintiffs' work, confirming that the relationship is one of employee and employer rather than an arm's-length business-to-business arrangement by dictating fares, equipment charges, insurance premiums, technology fees, maintenance costs, and miscellaneous surcharges and by collecting those amounts automatically before the driver receives any wages.

### Discipline and Termination at Will

57.     IRIS drivers face extreme levels of monitoring and discipline by Defendant, highly characteristic of a traditional employer-employee relationship. According to Defendant's own policies, Defendant holds the heavy-handed ability to suspend or terminate drivers at any time and for any reason, including but not limited to violation of policy, poor performance metrics, or customer complaints.

58.     Drivers face progressive discipline under Defendant's matrix, beginning with paycheck deductions, escalating to suspension, and culminating in termination.

59.     For example, IRIS drivers lose pay, are suspended, and ultimately terminated for cell-phone violations, customer complaints they never directly receive, policy violations, and attendance issues.

60.     Defendant conducts performance evaluations of IRIS drivers, assessing their acceptance rates, delay times, drive-time efficiency, and more.

61.     Defendant retains ultimate authority over Plaintiffs' ability to earn income, further demonstrating its pervasive control over the means and manner of Plaintiffs' work because Defendant alone determines when to deduct pay, suspend, or terminate drivers, without a neutral review process and without providing meaningful evidence or an opportunity to be heard.

### Drivers Cannot Work Elsewhere When Scheduled for IRIS

62.     IRIS shifts are scheduled in blocks that typically begin as early as 4:30 a.m. and can extend past 11:30 p.m., with only short gaps between assignments. Drivers are expected to remain logged into the IRIS tablet, in uniform, and physically present in an approved vehicle for the entire duration of each scheduled block.

63.     These mandatory shifts are commonly eight to twelve hours long. During an IRIS shift, an IRIS driver must maintain continuous two-way radio contact with dispatch. A driver who powers down the radio or moves the vehicle outside the designated service zone for too long will be removed from the driving schedule for the day and receive a paycheck deduction.

64.     During their shifts, IRIS drivers are prohibited from transporting passengers under any other platform, such as Uber or Lyft, or engaging in any other work, such as food delivery. Because Defendant dictates the branding requirements, insurance endorsements, and exclusive-use rules, drivers cannot legally repurpose their cars during a shift without violating Defendant's policies and risking immediate termination.

-13-

65. The practical realities of the job—lengthy shift windows, constant surveillance by Defendant's dispatch, and algorithmic trip assignments that can arrive at any moment—make it infeasible for drivers to engage in passenger-transport work for any other entity during IRIS hours.

66. By structuring shifts that monopolize a driver's time and by imposing exclusive-use conditions on both company and personal vehicles, zTrip materially restricts Plaintiffs' ability to pursue independent business opportunities, highlighting their economic dependence on zTrip and further demonstrating zTrip's control over the manner and circumstances of their labor.

**The Work is Integral, "Low Skill," and Performed with zTrip's Capital**

67. Defendant maintains a service contract with the Kansas City Area Transportation Authority ("KCATA") to operate the IRIS program.

68. The passenger-transport functions performed by Plaintiffs are the very service zTrip promises KCATA and its riders; without drivers completing daily routes, zTrip would earn no revenue under the IRIS contract.

69. The position requires no professional credential beyond a Missouri Class E driver's license and the single-day orientation described herein; zTrip's own training program supplies all instruction on route navigation, tablet operation, passenger assistance, and company policy.

70. Because the work involves routine driving and customer-service tasks governed by step-by-step procedures, it can be performed by individuals with modest experience and minimal specialized skill.

-14-

71.    Plaintiffs typically receive four to six scheduled shifts per week, totaling forty or more "service hours," and many remain on the roster for consecutive months without a fixed end date.

72.    Defendant dictates the equipment standards, embeds its operating systems in vehicles, and relies on Plaintiffs to deliver the very transportation services for which Defendant is paid, thereby placing Plaintiffs at the economic hub of Defendant's business, reinforcing their dependence on zTrip, and confirming the employer-employee nature of the relationship.

**Resulting Statutory Violations**

73.    Throughout their respective tenures, Plaintiffs routinely accumulated service hours in excess of forty (40) hours per seven-day workweek, as reflected in the clock-in and clock-out data stored on the IRIS tablet and Defendant's scheduling system.

74.    For all hours worked beyond forty (40) in a workweek, zTrip continued to pay Plaintiffs at the same straight-time hourly rate it designated as the service wage, offering no premium compensation whatsoever for overtime hours.

75.    zTrip further reduced each week's gross earnings by deducting the vehicle-lease fee, insurance premium, tablet-rental charge, cellular-data fee, mandatory carwash fee, voucher-processing percentages, and performance-related monetary penalties described herein, most of which were not disclosed until after the deductions had already been taken.

76.    Plaintiffs' effective hourly compensation frequently fell well below the lowest promised range of thirty-two to thirty-seven dollars ($32–$37) per service hour and,

-15-

on multiple occasions, after zTrip's fees and gas expenses, dropped below the statutory minimum wage in effect in the State of Missouri as a result of the aforementioned, undisclosed and unilateral deductions.

77.     Plaintiffs were, at all relevant times, employees within the meaning of the Fair Labor Standards Act and the Missouri Minimum Wage Law because zTrip exercised pervasive control over the manner, means, schedule, pricing, equipment, discipline, and continuity of Plaintiffs' labor as detailed herein.

78.     zTrip's failure to pay one-and-one-half times Plaintiffs' regular rate for hours worked in excess of forty (40) per week, and its practice of imposing undisclosed deductions that reduced net pay below statutory thresholds, constitute violations of both federal and Missouri wage-and-hour statutes.

79.     zTrip knew or showed reckless disregard for the fact that its pay practices were unlawful, rendering its violations willful and subjecting the company to the extended limitations period and liquidated-damages provisions available under the Fair Labor Standards Act.

80.     Plaintiffs therefore seek to recover unpaid wages, restitution of all unlawful deductions, an equal amount in liquidated damages, statutory interest, reasonable attorneys' fees, and costs of suit, together with such other and further relief as the Fair Labor Standards Act, the Missouri Minimum Wage Law, and the common law allow.

<u>**COUNT I**</u>
**FLSA COLLECTIVE ACTION**
***By Plaintiffs on behalf of themselves and the FLSA Collective***

81.     Plaintiffs, on behalf of themselves and others similarly situated, reallege and

incorporate by reference the preceding and following paragraphs as if fully set forth here.

82. The FLSA requires each covered employer, such as Defendant, to compensate all non-exempt employees at a rate of not less than one and one-half the regular rate of pay for work performed over forty hours in a workweek.

83. As described above, Defendant exerts extensive control over the manner and means in which Plaintiffs and similarly situated drivers perform their work, thus creating an employment relationship under the FLSA.

84. Plaintiffs file this action on behalf of themselves and all other similarly situated drivers under § 216(b) of the FLSA. Plaintiffs propose the following collective class for their FLSA claims:

> All drivers who worked, or will work during the liability period, as drivers for Defendant's micro-transit programs at any time from three years prior to the filing of this Complaint who were not paid one and one-half their regular rate of pay for all hours worked in excess of forty per workweek (the "FLSA Collective").

85. Section 16 of the FLSA, 29 U.S.C. § 216(b), allows Plaintiffs to bring this Complaint as an "opt-in" collective action for all Plaintiffs' claims because Plaintiffs' claims are similar to the claims of the FLSA collective.

86. By filing this Complaint, Plaintiffs consent in writing to be part of this action, as required by 29 U.S.C. § 216(b) and evidenced by the 'Plaintiff Consent Form' documents attached to this Complaint as Exhibit A.

87.     During the applicable statutory period, Plaintiffs and the FLSA Collective routinely worked over forty (40) hours per workweek for Defendant without receiving overtime pay for their overtime hours in violation of the FLSA.

88.     Plaintiff and the FLSA Collective are similarly situated because they have job duties entitling them to overtime pay; they experience a uniform pattern and practice of Defendant's control over the manner and means of their work; Defendant has published and implemented uniform policies and procedures that govern the working conditions of all drivers in the FLSA Collective; Plaintiffs and the FLSA Collective are required to use the same software to receive their schedules and ride assignments; Plaintiffs and the FLSA Collective are subject to a uniform hourly pay policy set by Defendant; and Plaintiffs and the FLSA Collective are subject to the same pattern and practice of Defendant's misclassification to avoid paying Plaintiffs and the FLSA Collective overtime for hours worked over forty per workweek.

89.     Defendant is liable under the FLSA, 29 U.S.C. § 201, *et seq.*, for failing to properly compensate Plaintiffs and the FLSA Collective for overtime equal to one and one-half their regular rates of pay for all hours worked over forty per workweek.

90.     Plaintiffs and the FLSA Collective are victims of Defendant's systematic, widespread, uniform, and repeated illegal policies that have violated their rights under the FLSA and caused significant damage to Plaintiffs and the FLSA Collective.

91.     Defendant's conduct constitutes a willful violation of the FLSA under 29 U.S.C. § 255(a) because Defendant knew, or showed reckless disregard for, the fact that its compensation practices were in violation of these laws.

92.     As the direct and proximate result of Defendant's unlawful conduct, Plaintiffs and the FLSA Collective have suffered, and will continue to suffer, a loss of income and other damages. Under § 216(b) of the FLSA, Plaintiffs and the FLSA Collective are entitled to liquidated damages, attorneys' fees, and costs incurred in enforcing this claim.

93.     Plaintiffs and the FLSA Collective have suffered from Defendant's common policies and would benefit from the Court issuing a Court-supervised notice of this lawsuit and the opportunity to join. Similarly situated employees are known to Defendant and are readily identifiable through Defendant's records.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and others similarly situated, pray for relief as follows:

(a)     Designation of this action as a collective action on behalf of the FLSA Collective and prompt issuance of notice under 29 U.S.C. § 216(b) to all similarly situated members of the FLSA Collective informing them of the pendency of this action and permitting them to assert timely FLSA claims in this action by filing individual consent forms;

(b)     A finding that Plaintiffs and FLSA Collective members were employees of Defendant at all relevant times;

(c)     Judgment against Defendant finding it failed to properly pay Plaintiffs and FLSA Collective members overtime at the correct overtime rate of pay as required under the FLSA;

(d)     Judgment against Defendant for Plaintiffs and FLSA Collective members for damages for unpaid overtime pay;

(e)     An amount equal to their damages as liquidated damages;

(f)     A finding that Defendant's violations of the FLSA are willful;

-19-

(g)     All costs and attorneys' fees incurred in prosecuting this claim;

(h)     To the extent liquidated damages are not awarded, an award of prejudgment interest;

(i)     Leave to add additional plaintiffs by motion, the filing of consent forms, or any other method approved by the Court;

(j)     Leave to amend to add additional state-law claims; and

(k)     All further relief as the Court deems just and equitable.

<u>**COUNT II**</u>
**MMWL OVERTIME CLASS UNDER RULE 23**
*By named Plaintiffs on behalf of themselves and the MMWL Class*

94.     Plaintiffs, on behalf of themselves and others similarly situated, reallege and incorporate by reference the preceding and following paragraphs as if fully set forth here.

95.     As further set forth above and at all relevant times, Plaintiffs and similarly situated drivers are and were employees of Defendant as defined by Mo. Rev. Stat. § 290.500(3).

96.     As further set forth above and at all relevant times, Defendant was an employer of Plaintiffs and similarly situated drivers as defined by Mo. Rev. Stat. § 290.500(4).

97.     The MMWL requires an employer like Defendant to pay employees such as Plaintiffs and similarly situated drivers one and one-half times their regular rate of pay for all hours worked over forty in a workweek. Mo. Rev. Stat. § 290.505.1.

98.     Plaintiffs bring their MMWL overtime claim as a class action under Federal Rule of Civil Procedure 23, on behalf of the following proposed class:

All drivers who worked, or will work during the liability period, as drivers for Defendant's micro-transit programs in Missouri at any time from three years prior

-20-

to the filing of this Complaint who were not paid one and one-half their regular rate of pay for all hours worked in excess of forty per workweek (the "MMWL Class").

99.     Defendant violated the MMWL by failing to pay Plaintiff and the MMWL Class overtime wages during each pay period for all overtime hours worked.

100.    Class-action treatment of Plaintiffs' MMWL claim is appropriate because, as further alleged below, Plaintiffs satisfy the class-action requirements of Federal Rule of Civil Procedure 23.

101.    **Typicality.** Plaintiffs are members of the MMWL Class, and their claims are typical of the claims of other MMWL Class members. For example, Plaintiffs and the MMWL Class members share the same legal and financial interests in obtaining judicial findings that (1) they were employees of Defendant at all relevant times and (2) Defendant violated the MMWL by failing to pay them at the proper overtime rate of pay for all hours worked over forty in a workweek. Plaintiffs have no interests that conflict with the MMWL Class members' interests in obtaining these findings.

102.    Furthermore, Plaintiffs and the MMWL Class members were subjected to the same systematic and pervasive patterns and or practices by Defendant, including, but not limited to: (1) misclassifying Plaintiffs and the MMWL Class members as independent contractors; (2) exerting extensive control over Plaintiffs and the MMWL Class members so that Defendant created an employment relationship with Plaintiffs and the MMWL Class members; and (3) failing to pay Plaintiffs and the MMWL Class members overtime for their hours worked over forty per workweek.

103. **Numerosity.** The MMWL Class includes over fifty individuals and is so numerous that joinder of all class members is impracticable.

104. **Adequacy.** Plaintiffs will fairly and adequately represent the interests of the MMWL Class because their interests do not conflict with the interests of the MMWL Class. Plaintiffs have retained counsel competent and experienced in complex class-action litigation and will prosecute this action vigorously on the Class members' behalf.

105. **Commonality.** Questions of law and fact are common to the MMWL Class. Plaintiffs and the MMWL Class have been subjected to Defendant's common business practices as alleged throughout this Complaint, and whether they prevail on their claims will depend on the Court's resolution of common questions of law and fact. Common questions of fact include, but are not limited to, whether Plaintiffs and the MMWL Class members were employees of Defendant; whether Defendant's pattern and practice of exerting control over Plaintiffs and the MMWL Class members created an employment relationship; and whether Plaintiffs and the MMWL Class members worked over forty hours per workweek. Common questions of law include, but are not limited to, whether Defendant's failure to pay Plaintiffs and the MMWL Class members one and one-half their regular rate of pay for hours worked over forty per workweek violated the MMWL.

106. Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(1) because if MMWL Class members were to prosecute actions separately, it would create a risk of inconsistent or varying adjudications resulting in incompatible standards of conduct for Defendant. Adjudications with respect to individual class members would be dispositive of the interests of non-party MMWL Class members.

-22-

107.    **Predominance and Superiority.** Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because common questions of law and fact predominate over questions affecting only individual MMWL Class members. Without class litigation, courts would have to resolve these common questions of law and fact in multiple proceedings, making class litigation superior to other available methods for the fair and efficient adjudication of this litigation. Defendant's pattern and practice of exerting extensive and widespread control over the drivers and denying these same drivers overtime pay is so pervasive and uniform that individual actions would be numerous, expensive, burdensome, inefficient, and unlikely to draw enough attorneys to handle the claims.

108.    Under the MMWL, Mo. Rev. Stat. § 290.527, Plaintiffs and the MMWL Class are entitled to their overtime pay, an additional amount in liquidated damages, as well as their costs and reasonable attorneys' fees.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and others similarly situated, pray for relief as follows:

(a)    Designation of this action as a class action under Federal Rule of Civil Procedure 23 on behalf of the MMWL Class and issuance of notice to said members apprising them of the pendency of this action;

(b)    Designation of Darian Hall and Abubakar Mohamed as representative Plaintiffs of the MMWL Class;

(c)    Designation of the undersigned attorneys as the attorneys representing the MMWL Class;

(d)    A declaratory judgment that Plaintiffs and the MMWL Class members were employees of Defendant at all relevant times;

(e)     A declaratory judgment that the practices complained of herein are unlawful under the MMWL;

(f)     An injunction against Defendant and its officers, agents, successors, employees, representatives, and any and all persons acting together with Defendant, as provided by law, from engaging in each of the unlawful practices, policies, and patterns set forth herein;

(g)     An award of damages for wages due to the Plaintiffs and the MMWL Class, including liquidated damages allowed under the MMWL to be paid by Defendant;

(h)     Costs and expenses incurred in this action, including reasonable attorneys' fees and expert fees;

(i)     Pre-judgment and post-judgment interest, as provided by law; and

(j)     Any and all further legal and equitable relief as the Court deems necessary, just and equitable.

<u>**COUNT III**</u>
**UNJUST ENRICHMENT**
*By named Plaintiffs on behalf of themselves and the Unjust Fees Class*

109.    Plaintiffs, on behalf of themselves and others similarly situated, reallege and incorporate by reference the preceding and following paragraphs as if fully set forth here.

110.    Plaintiffs bring this claim as a Federal Rule of Civil Procedure 23 class action on behalf of a class defined as follows:

All drivers who worked, or will work during the liability period, as drivers for Defendant in Missouri who have had fees unilaterally fixed by Defendant deducted from their advertised hourly rate of pay within the applicable period of limitations ("Unjust Fees Class").

111.    **Typicality.** Plaintiffs' claims are typical of the claims of the members of the Unjust Fees Class. Like the Unjust Fees Class members, Plaintiffs worked for Defendant at an advertised hourly rate of pay and had fees unilaterally set by Defendant automatically deducted from their pay. Like the Unjust Fees Class members, Plaintiffs received the

-24-

remainder of their advertised hourly rate of pay only after Defendant deducted its unilaterally set and unilaterally calculated fees, including, but not limited to, a set percentage of Plaintiffs' and Unjust Fees Class members' pay as a voucher processing fee; carwash fees; insurance fees; daily lease fees; and others.

112. **Commonality.** Common questions of law and fact exist as to all members of the Unjust Fees Class and predominate over questions solely affecting individual members of the Unjust Fees Class. Questions of fact common to the class include, but are not limited to: whether Defendant has engaged and engages in a pattern and or practice of advertising an hourly rate of pay to Plaintiffs and the Unjust Fees Class members; whether Defendant has engaged and engages in a pattern and or practice of unilaterally fixing and deducting fees from Plaintiffs' and the Unjust Fees Class members' pay; and whether Defendant has benefited and benefits from Plaintiffs' and the Unjust Fees Class members' work and its fee deductions from their advertised hourly rate of pay. Questions of law common to the class include, but are not limited to, whether it is inequitable for Defendant to retain the benefits of Plaintiffs' and Unjust Fees Class members' work and deducted fees.

113. **Numerosity.** Defendant has employed hundreds of drivers at an advertised hourly rate of pay and then unilaterally fixed and deducted fees from these drivers' advertised hourly rate before paying the drivers. Given the pervasive and systemic nature of Defendant's unlawful fee deductions, the members of the Unjust Fees Class are so numerous that joinder of all members is impractical.

114. **Adequacy.** Plaintiffs will fairly and adequately represent the interests of the Unjust Fees Class because their interests do not conflict with the interests of the Unjust

Fees Class. Plaintiffs have retained counsel competent and experienced in complex class-action litigation and will prosecute this action vigorously on the Class members' behalf.

115.    Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(1) because if Unjust Fees Class members were to prosecute actions separately, it would create a risk of inconsistent or varying adjudications resulting in incompatible standards of conduct for Defendant. Adjudications with respect to individual class members would be dispositive of the interests of non-party Unjust Fees Class members.

116.    **Predominance and Superiority.** Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because common questions of law and fact predominate over questions affecting only individual Unjust Fees Class members. Without class litigation, courts would have to resolve these common questions of law and fact in multiple proceedings, making class litigation superior to other available methods for the fair and efficient adjudication of this litigation. Defendant's pattern and practice of unilaterally deducting fees from drivers' paychecks is so pervasive and uniform that individual actions would be numerous, expensive, burdensome, inefficient, and unlikely to draw enough attorneys to handle the claims.

117.    Plaintiffs and Unjust Fees Class members have worked for and continue to work for Defendant at an advertised hourly rate of pay, and Defendant unilaterally deducts fees from Plaintiffs' and the Unjust Fees Class members' paychecks before they receive the remainder of their pay. Plaintiffs' and the Unjust Fees Class members' work and the fees Defendant deducts from their advertised hourly rate of pay are benefits to Defendant from Plaintiffs and the Unjust Fees Class.

118. Defendant has and does appreciate this benefit.

119. Defendant has and does retain these benefits under such circumstances that it would be inequitable for Defendant to retain these benefits without payment to Plaintiffs and the Unjust Fees Class of their full advertised hourly rate of pay.

120. Defendant is liable to Plaintiffs and the Unjust Fees Class for all fees unilaterally set and deducted by Defendant from Plaintiffs' advertised hourly rate of pay.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and the Unjust Fees Class, pray for relief as follows:

(a) Certification of this action as a class action on behalf of the Unjust Fees Class under Federal Rule of Civil Procedure 23;

(b) Designation of Abubakar Mohamed and Darian Hall as representative Plaintiffs of the Unjust Fees Class;

(c) Designation of the undersigned attorneys as the attorneys representing the Unjust Fees Class;

(d) Judgment in favor of Plaintiffs and the Unjust Fees Class members and against Defendant for unjust enrichment under the Missouri common law;

(e) An injunction against Defendant and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with Defendant, as provided by law, from engaging in each of the unlawful practices, policies, and patterns set forth herein;

(f) An award of compensatory damages for Plaintiffs and the Unjust Fees Class members;

(g) Pre-judgment interest on Plaintiffs' and the Unjust Fees Class members' unpaid wages from the date such wages were earned and due;

(h) All costs and expenses of this action, including reasonable attorneys' fees and expert fees;

(i)     All further relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiffs, on behalf of themselves and the FLSA Collective, MMWL Class, and the Unjust Fees Class hereby demand a jury trial on all claims so triable. Plaintiffs hereby state that the trial location in this matter should be Kansas City, Missouri.


Respectfully submitted,

**ATTORNEYS AT HEARTLAND CENTER FOR JOBS & FREEDOM**

_____          _____

Gina Chiala, MO # 59112
Jordan Hoffman Kahle, MO # 74718, WDMO: #KS-001311
4120A Baltimore Avenue
Kansas City, Missouri 64111
Telephone: (816) 300-1896
Fax: (816) 278-5785
Email: GinaChiala@jobsandfreedom.org
Email: JordanHoffmanKahle@jobsandfreedom.org

and

BOYD KENTER THOMAS & PARRISH, LLC

_(signature)_

_____

Mark E. Parrish        Mo. Bar No. 40571
Brianne Thomas        Mo. Bar No. 58843
Joshua A. Sanders    Mo. Bar No. 64305
Raymond E. Salva, Jr.  Mo. Bar No. 66191
221 W. Lexington Avenue, Suite 200
Independence, Missouri 64050
Telephone: (816) 471-4511
Facsimile:  (816) 471-8450
E-mail:  mparrish@bktplaw.com
E-mail:  bthomas@bktplaw.com
E-mail:  jsanders@bktplaw.com
E-mail: rsalva@bktplaw.com
*ATTORNEYS FOR PLAINTIFFS*